UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

MICHELE MONSON,                          :
                                         :
                Plaintiff,               :
                                         :
                                         :       NO.
                                         :
THE WHITBY SCHOOL, INC.,                 :
                                         :
                Defendant.               :       JULY 9, 2009

### COMPLAINT

Plaintiff Michele Monson, the former Head of School of The Whitby School, brings this action pursuant to Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. § 2000e, et seq., & § 1981a(b), the Connecticut Fair Employment Act, Conn. Gen. Stat. § 46a-60, et seq., and Connecticut common law.  Plaintiff seeks redress for economic injury she has suffered because defendant has subjected her to unlawful employment discrimination on the basis of her sex.  Plaintiff further seeks to remedy the career and other damages she has suffered as a result of the defendant's breach of contract and wrongful misconduct in the termination of her employment.

### I.    JURISDICTION

1.     The jurisdiction of this Court is invoked with respect to plaintiff's federal claims pursuant to 42 U.S.C. § 2000e-5(f)(3), 29 U.S.C. §626(c)  and 28 U.S.C. § 1331, and pursuant to 28 U.S.C. § 1367, providing supplemental jurisdiction over plaintiff's state law claims.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that defendant The Whitby School, Inc. maintains a place of business in the State of Connecticut and plaintiff was formerly employed by defendant Whitby School at that Connecticut place of business and a substantial part of the events or omissions giving rise to the claims herein occurred in the State of Connecticut.

## II.    PARTIES

3.      Plaintiff Michele Monson is a resident of Santa Fe, New Mexico.

4.      Defendant The Whitby School, Inc. is a Connecticut non-profit corporation with its principal place of business in Greenwich, Connecticut.

## III.    STATEMENT OF FACTS

5.      Plaintiff Michele Monson is a highly qualified educational administrator, with extensive experience as a teacher, administrator and educational consultant working with schools, school districts and local and state educational agencies on a wide range of projects, including curriculum development, implementation of curriculum standards, teacher professional development, and the development and implementation of evaluations and assessment of both student and teacher performance.  Dr. Monson also has a Doctorate in Administration, Planning and Social Policy from the Harvard University Graduate School of Education, which she received in 1999.

6.      In the summer of 2000, Dr. Monson was actively recruited by defendant The Whitby School, Inc. ("Whitby") to serve as Head of School.  Dr. Monson assumed the position of

2

interim Head of School in the summer of 2000 and was appointed as Head of School in October, 2000.

7.     Dr. Monson served as Head of School at Whitby from 2000 through March 2008 and had an extremely successful tenure, to the benefit of Whitby.

8.     At the time that Dr. Monson assumed the position of Head of School, Whitby's teacher salaries were below market levels, there were no teacher accountability standards for achieving particular results, and no administrative or faculty performance management and evaluation processes were in place.  There was inadequate curriculum for all but the pre-school grades in the school, and the school suffered from a deeply entrenched culture that was resistant to necessary changes.  During Dr. Monson's initial tenure as Head of School, she developed a Strategic Plan for the school, implemented needed curriculum changes, faculty and administrative performance accountability standards, reformed the business and admissions offices (where she had uncovered serious problems), and created a more sophisticated and professional structure necessary to make the school competitive in the private school marketplace in the region.

9.     As a result of her success in the position, Dr. Monson's contract to serve as Head of School was renewed in June 2004 for a four-year term.

10.     After the renewal of her contract, Dr. Monson continued to successfully implement the school's five-year Strategic Plan, and secured accreditation for Whitby from the American Montessori Society (AMS) and the Connecticut Association of Independent Schools (CAIS).  The accreditation from CAIS was particularly significant as that association had informed the school that they would not participate in a joint accreditation with AMS and that the

3

School had to meet standards exclusive to CAIS. Dr. Monson's leadership in securing accreditation for the school from CAIS reflected the substantial improvement of the curriculum and the quality of faculty, and the implementation of best practices policies and organizational changes achieved during her tenure. The accreditation from AMS was also significant since changes at Whitby being implemented as part of the school's strategic plan were contrary to AMS's existing requirements for academic grouping. AMS modified its accreditation standards as a result of Dr. Monson's petition for variance, and allowed accreditation of a new program grouping structure, the Middle Elementary. .

11.     During her employment as Head of School, Dr. Monson was also extremely successful in making Whitby considerably more visible in the area and in the independent school community. Dr. Monson oversaw successful capital campaigns and building projects which increased the size of the Whitby School campus, made it possible for Whitby to add new academic programs and resulted in increased retention of students into the elementary and middle school programs. Dr. Monson was the first Whitby Head of School to attend meetings of heads of school in Fairfield and Westchester counties. Dr. Monson also participated actively in mentoring efforts with heads of other independent schools in the tri-state region, serving on accreditation committees evaluating other independent schools. Dr. Monson, further, served on committees for CAIS and for AMS during her tenure, attended and spoke at national and international educational conferences, published articles in several educational journals, and was selected as a Klingenstein Fellow from the Klingenstein Center for Independent School Education at Teachers College, Columbia University.

4

12.     Throughout Dr. Monson's employment as Head of School, defendant Whitby School consistently recognized the high quality of her job performance and contributions to the school. In 2006 and 2007, she was awarded the maximum possible discretionary bonus (5% of base salary) under the terms of her contract with Whitby based on the determination of the Head's Mentoring Committee that she had so successfully achieved certain goals mutually agreed upon by Dr. Monson and the Board of Trustees so as to justify the award of the maximum discretionary bonus. Indeed, Dr. Monson was awarded the maximum possible discretionary bonus by Whitby in every school year but one during which she served as Head (and in the one year in which she did not receive the maximum 5%, received a discretionary bonus of 4.5%).

13.     At all times relevant herein, decisions concerning the retention and contract terms for Whitby's Head of School are referred in the first instance to the Head's Mentoring Committee of Whitby's Board of Trustees. In April 2007, the Head's Mentoring Committee evaluated Dr. Monson's performance as Head of School, and, as a result of her successes on behalf of the school, recommended that Dr. Monson's contract be renewed and that it be renewed for a six year term to end on June 30, 2013.

14.     The recommendation of the Head's Mentoring Committee for a second renewal of Dr. Monson's contract was particularly reflective of her success as Head of School, since Whitby's Board of Trustees approached Dr. Monson about that renewal in the spring of 2007 – fully a year and a half before Whitby had to act to renew her contract. (The contract signed in July 2004 was for a four year term expiring in July 2008, and would have been renewed automatically for a year unless Whitby gave notice of termination to her by December 2007).

15.    Based on the Head Mentoring Committee's recommendation, Whitby's full Board of Trustees approved the renewal of Dr. Monson's contract for a six-year term beginning effective June 19, 2007.

16.    In approaching Dr. Monson in the spring of 2007 about the early renewal of her contract – and in determining to renew her contract for a six-year term (rather than the four year term provided under her prior contract) – Whitby's then-Board of Trustees took "affirmative action" to send a "strong and positive" message that Whitby wanted to keep Dr. Monson employed as Head of School.  And, notwithstanding that her then-current contract did not expire until July 2008, the then-Board insisted that the new contract go into effect immediately so as to raise her compensation to a level competitive with other Head of School positions in the Fairfield County - Westchester County area.

17.    Pursuant to the contract, Dr. Monson was entitled to receive base compensation of $225,000.00 annually (to be increased commensurate with any increase approved by Whitby's Board of Trustees for all employees of Whitby), plus a discretionary bonus of not less than three percent nor greater than five percent of base compensation.  In addition, Dr. Monson was entitled to receive a deferred compensation package including a Section 457(b) Plan, a Section 457(f) Supplemental Retirement Plan, participation in Whiby's Section 403(b) retirement plan, as well as other benefits and compensation.  Dr. Monson was also entitled to reside at the Head's House on the Whitby campus, and was allowed full use of a school vehicle.  The contract further obligated Whitby to pay all moving, storage and insurance fees to move any of Dr. Monson's belongings into the Head's House, for contents insurance of those belongings while maintained

6

in the Head's House and for storage and insurance of any personal belongings not moved into the Head's House.

18.     Pursuant to the contract, defendant Whitby School was not allowed to terminate Dr. Monson's employment except for "cause" limited to specifically enumerated circumstances. Moreover, under the contract, if defendant Whitby School asserted that Dr. Monson was failing to perform the Head's duties at school, such a failure could not constitute "cause" unless "a reasonable written demand for such performance is delivered to the Head by the Board that specifically identifies the manner in which the Board believes the Head has not performed her duties."

19.     Prior to the start of the 2007-2008 school year, the Head's Mentoring Committee of the Whitby Board of Trustees met with Dr. Monson to establish her performance goals for the upcoming academic year. Those goals were (1) to work with the Treasurer and outside accounting firm to improve operations in the business office; (2) provide assistance from the Head's office to the Parent's Association and manage more effectively communications with the Parent's Association; and (3) to work with necessary school constituencies to achieve candidate status for two school programs for International Baccalaureate accreditation.

20.     By March 1, 2008, Dr. Monson had substantially achieved all of the performance goals set for her by the Head's Mentoring Committee for the 2007-2008 academic year. Dr. Monson had obtained candidate status for the school programs for International Baccalaureate accreditation well before the deadline, and had, further, made substantial progress toward an accelerated schedule for the actual accreditation in the next school year. With respect to her goal of enhancing coordination with the Parent's Association, Dr. Monson had developed a new

7

position of Assistant to the Head of School for community Relations, hired a candidate for the position, implemented procedures for coordinating all Parent Association communications through the Head's Office and established the new position as a *de facto* secretary to the president of the Parent's Association. With respect to the goal of improving the school's business operations, Dr. Monson worked closely with the Treasurer and Finance Committee of the Board of Trustees (which was charged under Whitby's charter with the authority to hire and set the salary for a full-time chief Financial Officer) to identify candidates for the CFO position. And, because Whitby had historically had significant difficulty hiring a full-time CFO, Dr. Monson recommended retention of an outside accounting firm, and worked closely with that outside firm and the school's Treasurer to fill the void left by the lack of a CFO.

21.      Effective July 1, 2007, Ashwin Vasan became the Chairman of the Whitby Board of Trustees.

22.      Effective in or about December 2007 or January 2008, Vasan caused Richard Lukaj to be made a member of the Whitby Board of Trustees. Defendant Lukaj's appointment as a trustee of the Whitby School occurred in derogation of the governance process required under the school's charter in that Lukaj was not vetted by the Governance Committee of the Board responsible for approving new candidates for the Board.

23.      Notwithstanding the consistently high quality of Dr. Monson's job performance and contributions to the school in the past and her continuing successes toward reaching her performance goals in the 2007-2008 academic year, beginning in or about the fall of 2007,

Vasan and Lukaj, and others associated with them, determined to replace Dr. Monson as Head of School.

24.     Beginning with his elevation, Vasan embarked on a concerted effort to remove the existing leadership of Whitby and to replace them with an entirely male team.  Thus, although the prior Board of Trustees was evenly divided between male and female trustees, Vasan replaced every single retiring board member with a male.  Significantly, although Whitby's by-laws provide that new members of the Board of Trustees are to be considered and approved by the Board's Governance Committee, the three new (male) members appointed by Vasan to the Board of Trustees, including Lukaj, were appointed without being first submitted to review by the Governance Committee.

25.     Had proper governance practices been followed, Lukaj would have been subject to particular scrutiny by the Governance Committee because he did not meet any of the criteria established by the Governance Committee for consideration as a Trustee and, in fact, had taken past actions relative to the enrollment of his children in the school which actually precluded his consideration as a candidate for trustee as they were grounds for dismissal of a sitting trustee. Additionally, at the time of his appointment he was seeking to re-enroll a child in the school notwithstanding that he had been advised by the school administration that the child was not appropriate for continued attendance at the school.  Dr. Monson was advised – first by Vasan's wife, Mari Vasan, and then by Vasan himself – to overlook these issues and to ensure that a contract was issued to the ineligible child, in order to secure a financial contribution from the family to the school.  Dr. Monson was subsequently advised – again, first by Mari Vasan and then by Vasan – to advocate for Lukaj's candidacy for trusteeship.  When Dr. Monson

9

confidentially expressed concerns to defendant Vasan regarding the inappropriate processes used in proposing Lukaj's candidacy and outlined the substance of her concerns relative to the criteria for candidacy and the child's status at the school, she was expressly directed to ignore them and prohibited from raising them in any other forum with either the Governance Committee or the Board of Trustees.

26.     Vasan and Lukaj and the two other new (male) appointees became the power center of the new Board of Trustees and effectively determined the decisionmaking process of the Board.

27.     In addition, under Whitby's by-laws, the President of the school's Parents' Association serves as an *ex officio* member of the Board of Trustees.  During the Board term beginning in July 2007, the presidency of the Parents' Association was jointly held by a husband and wife team.  Notwithstanding that there were two co-Presidents of the Parents' Association, Vasan appointed only the husband to serve as an *ex officio* member of the Board of Trustees.

28.     Vasan also determined to remove the senior administrative team at Whitby and to replace them with male successors.  As of July 1, 2007, the senior administrative team at the school were all female: Dr. Monson was Head of School, Valerie McCollum was the Business Manager, and Debbie Smith, Assistant Head for Administration and Operations.  Within nine months, Vasan had effected the removal of all three members of that team, and replacement by male counterparts.

a. Although in the late fall of 2007, Valerie McCollum was the only person performing all of the business functions of the school (since the Chief Financial Officer position was then vacant), Vasan and his team on the Board of Trustees determined to "eliminate" Ms.

10

McCollum's position. After Ms. McCollum left the school, her function was assumed by a male hire. It is plaintiff's understanding that, although this new hire has been given the title of Chief Financial Officer (and although the school has not hired a replacement Business Manager), the new male CFO has the same qualifications as Ms. McCullom and is effectively functioning as her replacement.

      b.    Debbie Smith was fired in late January or early February 2008, and was replaced by a male who did not have the same administrative expertise as Ms. Smith.

      c.    It is plaintiff's understanding that Vasan and the Finance Committee were in negotiations with replacements for both Ms. McCollum and Ms. Smith before either woman ceased employment with the school, and, in fact, that neither vacancy was ever posted by the school.

      d.    In addition, it is plaintiff's understanding that both male replacements have received benefits from the school (either parsonage or personal car usage) which had never previously been accorded to persons in those positions (or comparable positions) in the school administration.

    29.    Vasan also openly expressed contempt for the role of women (and plaintiff's role as a woman) in Whitby's governance and disparaged women's contributions to the school. In late January or early February of 2008, Vasan and Dr. Monson had an email exchange concerning a list of email contact information for Whitby School parents that Dr. Monson maintained for purposes of communicating with parents about issues and events concerning the school community. That list had been developed based on a questionnaire sent to the school's parents asking them to identify their preferred method of receiving email communications from the

school. A substantial portion of the email addresses on the list were those of the mothers (as opposed to the fathers) of our students. When Vasan learned that a substantial number of the school's fathers were not on our list, he wrote to Dr. Monson indicating that he considered the list to be inadequate since communications about important matters of school governance should be sent to fathers, not the mothers. After initially directing Dr. Monson to write the fathers to obtain their email addresses, Vasan changed his mind and indicated that he would write the fathers since the fathers would not be expected to be responsive to (or take seriously) a communication from Dr. Monson, a female.

30.     Vasan repeated this same sentiment in an open Parents' Association meeting that he held to discuss new plans for the school on February 13, 2008. Although Dr. Monson was asked not to attend that forum, attendees at the forum advised that Vasan repeated much the same language as he used in his prior email exchange with Dr. Monson. It is plaintiff's understanding that Vasan sought email addresses from school fathers. In seeking those addresses, Vasan expressly advised that he would assume sole control of that list and would be solely responsible for the content of any communications to the individuals on that list, and would ensure that the fathers received emails about only the important matters of school governance. It is further plaintiff's understanding that Vasan repeated his contemptuous sentiments about the role of women at the school, indicating, as he had in his email exchange with plaintiff, that less important communications (such as those about school events and "bake sales") from Dr. Monson and other (female) members of the administration would continue to go "home." At this meeting, Vasan went on further to introduce his "guys" to the parents, referring

12

to and introducing the male trustees he had brought onto the board, and indicated that the "school could not be in better hands."

31.     Consistent with his contempt for the role of women in school governance and his determination to replace the school leadership team with a team composed entirely of males, it is plaintiff's understanding that sometime in February 2008, if not before, Vasan and his team determined to replace Dr. Monson as Head of School and demote her to a position in which she would serve essentially as a curriculum development consultant.

32.     Defendant Vasan undertook to cause Dr. Monson's termination notwithstanding that the Board had determined to renew her contract only 6 months before, that her contract precluded her termination for any reasons other than narrowly defined "cause" (and only pursuant to express procedural protections), and notwithstanding that no performance issues had been raised at Dr. Monson's Head's Mentoring Committee review in late February.

33.     Unbeknownst to Dr. Monson, by January or early February 2008, defendants began a search for a Chief Operating Officer to replace Dr. Monson.  Indeed, Vasan announced the search for a Chief Operating Officer on February 13, 2008 on a conference call between the Board of Trustees and parents of school students from which Dr. Monson had been excluded.

34.     On information and belief, defendant identified a candidate to replace Dr. Monson as Head of School by early March 2008.  The candidate who ultimately replaced Dr. Monson was a male who had previously been interviewed by Dr. Monson for a position as Assistant Head for the school, and hired by Dr. Monson to be a speaker at Whitby's "Father's Day" event in the fall of 2007.

35.    On Saturday March 8, 2008, Vasan met with Dr. Monson and asked her to resign as Head of School.  Vasan did not give Dr. Monson any explanation for his request that she resign, other than to advise her that there were forces outside the Board's control at work.  Vasan further advised Dr. Monson that the Board had a candidate for the Chief Operating Officer position, but refused to tell Dr. Monson the identity of the candidate or when Whitby started the search.

36.    In the conversation on March 8, Vasan stated that, if Dr. Monson agreed to resign, he would make it worthwhile for her professionally and financially, including suggesting that she might be able to stay on at Whitby as Academic Dean for as long as three years (a time period coinciding with the accreditation periods for the new programs she had initiated), and indicating that she would be given time to write, research, and publish manuscripts on the academic improvements at the school.

37.    During the conversation on March 8, Vasan demanded that Dr. Monson advise him whether she would agree to resign by the next day, Sunday, March 9.  In response to Vasan's demands, Dr. Monson indicated that she could not make any decision without a written proposal.

38.    On Monday, March 10, Vasan caused a written separation offer to be provided to Dr. Monson.  Notwithstanding Vasan's prior representations, the proposed separation package did not offer Dr. Monson any ongoing role at the school and merely offered her six months' severance as a buy-out of the remainder of her contract as Head of School.  When Dr. Monson asked Vasan to explain the difference in writing between his verbal promises and the terms of the written agreement, Vasan said that the new Head of School would have to agree to any future role for Dr. Monson at the School.

14

39.     On Tuesday, March 11, the school publicly posted signs announcing an important Parents' Association meeting scheduled to be held two days later (presumably to announce Dr. Monson's replacement). That same day, Lukaj met with Dr. Monson and advised her that the Board was seeking her resignation because it was being pressured by big donors who were threatening to leave the school. Lukaj indicated that the Board needed a decision from Dr. Monson before the close of business that day.

40.     At 10 p.m. on the night of Tuesday, March 11, 2008, Dr. Monson received a written Statement of Discharge, purporting to terminate her employment "for cause."

41.     Notwithstanding that, pursuant to her contract, defendant Whitby School could not terminate her "for cause" for failing to perform the Head's duties at school, unless defendant had previously sent her "a reasonable written demand for such performance ... that specifically identifies the manner in which the Board believes the Head has not performed her duties," the letter dated March 11, 2008 was the first written communication received by Dr. Monson from the defendant purporting to allege any deficiency in her performance of her duties as Head of School. Indeed, Dr. Monson had, in fact, continued to meet with the Head's Mentoring Committee throughout the 2007-2008 school year and, in meetings held as late as the end of February 2008, the Head's Mentoring Committee had not raised any concerns about Dr. Monson's performance, but rather continued to voice strong support of Dr. Monson.

42.     The purported "reasons" for Dr. Monson's termination set forth in the Statement of Discharge dated March 11, 2008 were false and pretextual.

## IV.   CLAIMS FOR RELIEF

### A.   FIRST CLAIM FOR RELIEF [Violation of Title VII as to defendant The Whitby School, Inc.]

1.-42.   Paragraphs 1 through 42 of this Complaint are incorporated herein as paragraphs 1 through 42 of this First Claim for Relief.

43.   Plaintiff has exhausted her administrative remedies, having filed a charge of discrimination and retaliation with United States Equal Employment Opportunity Commission ["EEOC"] and the Connecticut Commission on Human Rights and Opportunities ["CHRO"], complaining of the conduct set forth herein.  Plaintiff was issued a Right to Sue Letter by the EEOC on April 29, 2009 and by the CHRO on April 17, 2009. (Copies of the Right to Sue Letters received by plaintiff from the EEOC and CHRO are attached hereto as Exhibit A.)

44.   Defendant Whitby School unlawfully and willfully discriminated against plaintiff Michele Monson because of her sex with regard to the terms, conditions and opportunities of her employment and by terminating her employment, in violation of Title VII of the 1964 Civil Rights Act (as amended), 42 U.S.C. § 2000e-2(a).

45.   As a result of defendant's actions as aforesaid, plaintiff Michele Monson has sustained and will in the future sustain financial loss, including lost wages and severe impairment to her career and future career opportunities and earnings.

46.   Defendant's conduct was undertaken with malice and/or with reckless indifference to plaintiff's federally protected eights.

16

**B.     SECOND CLAIM FOR RELIEF [Violation of the Connecticut Fair Employment Act as to defendant The Whitby School, Inc.]**

1.-43.  Paragraphs 1 through 43 of the First Claim for Relief are hereby incorporated as paragraphs 1 through 43 of this Second Claim for Relief.

44.     Defendant Whitby School unlawfully and willfully discriminated against plaintiff Michele Monson because of her sex with regard to the terms, conditions and opportunities of her employment and by terminating her employment, in violation of Conn. Gen. Stat. § 46a-60(a)(1).

45.     As a result of defendant's actions as aforesaid, plaintiff Michele Monson has sustained and will in the future sustain financial loss, including lost wages and severe impairment to her career and future career opportunities and earnings.

46.     Defendant's conduct was willful and in knowing disregard of plaintiff's protected rights.

**C.     THIRD CLAIM FOR RELIEF [Breach of Contract as to defendant Whitby School]**

1.- 42.  Paragraphs 1 through 42 of the First Claim for Relief are hereby incorporated as paragraphs 1 through 42 of this Third Claim for Relief.

43.     Defendant Whitby School's conduct, as aforesaid, constituted a breach of Dr. Monson's contract.

44.     Dr. Monson has sustained economic loss as a result of defendant's breach of her contract.

45.     All conditions precedent to suit for breach of contract have been satisfied.

17

## V.  **PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for the following relief:

1.  An order directing defendant The Whitby School, Inc. to reinstate plaintiff to her former position as Head of School (or to another appropriate position) and/or, if reinstatement is not fully ordered, an appropriate monetary award in lieu of reinstatement.

2.  Damages pursuant to 42 U.S.C. § 2000e-5(g) and 42 U.S.C. § 1981a(b) for plaintiff's lost past and future earnings and benefits as a result of defendants' unlawful sex discrimination;

3.  Punitive damages pursuant to 42 U.S.C. § 1981a(b) for damages suffered by plaintiff as a result of defendants' unlawful sex discrimination;

4.  Damages pursuant to Conn. Gen. Stat. § 46a-104 for plaintiff's economic losses as a result of defendants' acts of unlawful discrimination;

5.  Damages for plaintiff's economic and non-economic losses as a result of defendants' wrongful conduct under common law;

6.  Attorney's fees and costs of this action, pursuant to 42 U.S.C. § 2000e-5(k), and/or Conn. Gen. Stat. § 46a-104.

7.  Such other relief as the Court may deem appropriate.

PLAINTIFF MICHELE MONSON,


BY

DAVID S. GOLUB ct00145
JONATHAN M. LEVINE ct07584
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT 06904
Tel. 203-325-4491
Fax  203-325-3769
dgolub@sgtlaw.com
jlevine@sgtlaw.com


To the Clerk:

Please enter the following appearances on behalf of the plaintiff Michele Monson:

David S. Golub ct00145
Jonathan M. Levine ct07584
Silver Golub & Teitell LLP
184 Atlantic Street
P.O. Box 389
Stamford, Connecticut 06904
Tel. 203-325-4491
Fax  203-325-3769
dgolub@sgtlaw.com
jlevine@sgtlaw.com

19

## CLAIM FOR JURY TRIAL

Plaintiffs, through counsel, claim this matter for trial by jury.

PLAINTIFF MICHELE MONSON,

BY _____

DAVID S. GOLUB ct00145
JONATHAN M. LEVINE ct07584
SILVER GOLUB & TEITELL LLP
184 ATLANTIC STREET
P.O. BOX 389
STAMFORD, CONNECTICUT 06904
Tel. 203-325-4491
Fax  203-325-3769
dgolub@sgtlaw.com
jlevine@sgtlaw.com

20

# EXHIBIT A

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Michelle Monson<br>19 Vallecito Road<br>Santa Fe, NM 87506 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>Government Ctr, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is *CONFIDENTIAL (29 CFR §1601.7(a))* |
|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 16A-2008-01689 | Anne R. Giantonio,<br>Intake Supervisor | (617) 565-3189 |

**NOTICE TO THE PERSON AGGRIEVED:**

(See also the additional information enclosed with this form.)

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in a federal or state court **WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

| X | More than 180 days have passed since the filing of this charge. |
|---|---|
| ☐ | Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge. |
| X | The EEOC is terminating its processing of this charge. |
| ☐ | The EEOC will continue to process this charge. |

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

| ☐ | The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost. |
|---|---|
| ☐ | The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time. |

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

Area Director Robert L. Sanders,
Area Office Director

4/29/09

*(Date Mailed)*

| cc: | THE WHITBY SCHOOL, INC.<br>969 Lake Avenue<br>Greenwich, CT 06831 | Jonathan Levine, Esquire<br>P. O. Box 389<br>Stamford, CT   06904-0389 |
|---|---|---|

COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES

FORM 500(3)

## RELEASE OF JURISDICTION

COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES, ex rel.

Michele Monson
Complainant

Date: April 17, 2009

vs.

Whitby School
Respondent

CCHRO CASE NO.: 0920110
EEOC CASE NO.:   16a200801689

RELEASE OF JURISDICTION

Pursuant to Complainant's and/or Complaint's attorney(s) request dated **April 9, 2009**, the
Commission on Human Rights and Opportunities hereby releases its jurisdiction over the
above numbered and captioned complaint in accordance with Section 46a-101 of the
Connecticut General Statutes.   Also, in accordance with Section 46a-100, C.G.S.
Complainant is hereby authorized to commence a civil action against the Respondent in the
Superior Court for the judicial district in which the discriminatory practice is alleged to have
occurred or in which the Respondent transacts business. If this action involves a state
agency or official, it may be brought in the Superior Court for the Hartford-New Britain
judicial district.

**Please be advised that, pursuant to CONN. GEN. STAT. §46a-103, the Complainant or
Complainant's attorney must serve on the Commission, at 21 Grand Street, Hartford,
Connecticut 06106 at the same time all other parties are served, a copy of any civil
action filed pursuant to this release. The Commission must be so served because it
has a right to intervene in any action filed based on a release of jurisdiction.**

In granting this release, the Commission expressly finds, in accordance with Sections 46a-
100 and 46a-101(b) of the C.G.S., that all conditions precedent to the issuance of the
release of jurisdiction have been complied with inasmuch as the complaint was filed in
accordance with 46a-82 of the C.G.S. and the complaint has been pending for a period of
not less than 210 days, inasmuch as it was filed on **September 8, 2008** is still pending on
**April 17, 2009** a period in excess of two hundred and ten (210) days.

Rev. 2/6/02

Moreover, there is no reason to believe that the complaint will be resolved within a period of thirty (30) days from **April 13, 2009,** the date the Commission received Complainant's request for the Release of Jurisdiction, nor is the complaint currently scheduled for public hearing. [see Section 46a-101(c) of the Connecticut General Statutes].

The complainant must bring an action in Superior Court within ninety (90) days of receipt of this release and within two (2) years of the date of filing the complaint with the Commission. The Superior Court shall have such authority as is conferred upon it by Section 46a-104 of the C.G.S., and other laws of the State of Connecticut.

Concurrently, with the issuance of this Release of Jurisdiction, the Commission hereby administratively dismisses this complaint in accordance with Section 46a-101(d) of the Connecticut General Statutes. Furthermore, said dismissal is not subject to administrative judicial review.

Very truly yours,

Donald E. Newton
Chief of Field Operations

Dated and entered of record in the Commission's Administrative Office in Hartford, Connecticut on this 17th day of April, 2009.

cc: Complainant: Michele Monson
Complainant's Attorney: Attorney Jonathan M. Levine
Receipt for Certified Mail 7008 1300 0001 8354 7243
Respondent(s): Robert Curis, Dean of Business Affairs/CFO
            The Whitby School, Incorporated
Respondent's Attorney: Attorney Nicole C. Chomiak
Regional Manager: Tanya A. Hughes, Regional Manager
Southwest Regional Office

Rev. 2/6/02